IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| **ANDREW COOPERRIDER, et. al.** | : | Case No. 3:22-CV-00016 |
| Plaintiffs | : | |
| v. | : | |
| **ANDY BESHEAR, et. al.** | : | |
| Defendants | : | |

### PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT ANDY BESHEAR'S RENEWED MOTION TO DISMISS

Governor Andy Beshear ("Governor Beshear") previously moved this Court to dismiss claims against him. (Doc. 8, Doc. 8-1). He argued that Plaintiffs failed to state a claim against him personally, that the facts alleged against him were allegedly conclusory, and he argued for sovereign, absolute, and qualified immunity. *Id.* This Court agreed with him on qualified immunity and on his assertion that the allegations, purportedly, were illusory. (Doc. 26). Plaintiffs appealed that decision and the Sixth Circuit reversed, doing so in a way that is dispositive of Governor Beshear's recycled argument in his renewed motion to dismiss. (Doc. 37; Doc. 38).

More specifically, in *Cooperrider v. Woods*, 127 F.4th 1019 (6th Cir. 2025), the Sixth Circuit held that Joshua Newton, who was the person who signed the charges and presented the ABC case in a hearing, was akin to a prosecutor and thus had ***absolute quasi-prosecutorial immunity***, and also held that the ABC officials, who issued the order revoking Mr. Cooperrider's license, were akin to judges and thus also had absolute ***quasi-judicial immunity***. Significantly, the Sixth Circuit denied Governor Beshear ***qualified immunity***, and found that a First Amendment retaliation claim was appropriately and adequately asserted against him because the law protecting Plaintiffs from retaliation was clearly established. *Id.*

1

Now, and out of other options, Governor Beshear argues that he is somehow entitled to absolute immunity for his First Amendment retaliation, a level of immunity greater than the qualified immunity the Sixth Circuit just denied to him. As a matter of logic, application of the law, and the law of the case, Governor Beshear is wrong.

I.      FACTS[1]

Andrew Cooperrider ("Mr. Cooperrider") resides in Lexington and is the sole member of Deans Diner, LLC d/b/a Brewed ("Appellant Brewed"). (Pl.'s Ver. Compl., DE#1, ¶¶ 2-3, PageID#1-14). Andrew Beshear is the Governor of Kentucky. (*Id.* ¶4).

Starting on or about March, 2020, Mr. Cooperrider began making highly critical posts of and regarding Governor Beshear on social media including, without limitation, the Governor's actions shutting down businesses, his actions sending the Kentucky State Police into churches on Easter Sunday, his silencing of protesters critical of him, and related actions. (*Id.* ¶12). By November, 2020, Mr. Cooperrider, via his own social media page and the social media page of Brewed, engaged in a series of highly critical posts regarding Governor Beshear and his shuttering of restaurants and bars. (*Id.* ¶13). Mr. Cooperrider has continued to make the foregoing social media posts and speech from November, 2021, to the present. (*Id.* ¶14). Governor Beshear was aware of this social media activity by Mr. Cooperrider and Brewed and expressed that he was angered by it. (*Id.* ¶15). Governor Beshear directly addressed in his public statements and speeches the speech of Mr. Cooperrider that was critical of Governor Beshear, usually in a manner that expressed his anger at Mr. Cooperrider's speech. (*Id.* ¶16).

Prior to November 24, 2020, Governor Beshear issued Executive Orders prohibiting indoor dining and drinking in restaurants and bars. (*Id.* ¶17).

---

[1] Because this is a motion to dismiss, the facts are taken from the Complaint.

2

An enforcement action against Plaintiffs was instituted, seeking the revocation of their Alcohol Licenses, in Department of Alcoholic Beverage Control Case Number 20-ABC-179, on or about November 25, 2020, for non-compliance with those orders. (*Id.* ¶18). Not deterred, Mr. Cooperrider doubled down and led a citizen impeachment effort of Governor Beshear and engaged in significant amounts of additional protected speech which, at the same time, prompted the institution of other retaliatory measures against him. (*Id.* ¶19).

Some of this is reflected in email communications in December, 2020 by and between Defendants Duke, Newton, and Taylor, that reflect a concerted effort to deprive Plaintiffs of their alcohol licenses, irrespective of any hearing, law change, or any other matter. (*Id.* ¶20).

In February and March, 2021, the Kentucky General Assembly took action to reign in what it perceived to be an abuse of power by Governor Beshear. (*Id.* ¶21). The Kentucky General Assembly passed several pieces of legislation relevant to this action: namely, 21 RS HB1, 21 RS SB1, 21 RS HJR 77, and 21 RS HB 192. *Id.*

> First, 21 RS HB 1[2] provides, in relevant part:
>
> (1) (a) Any business, for-profit or not-for-profit organization, local government, association, or any school or school district, public, private, or religiously affiliated, may remain open and fully operational for in-person services so long as it adopts an operating plan that:
>
> 1. Meets or exceeds all applicable guidance issued by the Centers for Disease Control and Prevention or by the executive branch, whichever is least restrictive;
>
> 2. Details how the business, for-profit or not-for-profit organization, local government, association, or school or school district, whether public, private, or religiously affiliated, will foster the safety of employees, customers, attendees and patrons, including social distancing requirements; and
>
> 3. Is posted in a conspicuous place on the main entrance door of the physical location of the business, for-profit or not-for-profit organization, local government, association, or school or school district, whether public, private, or religiously affiliated, and on the Web

---

[2] https://apps.legislature.ky.gov/record/21rs/hb1.html (last visited 7/11/2024).

> site of the business, for-profit or not-for-profit organization, local government, association, or school or school district, whether public, private, or religiously affiliated, if one exists; (emphasis added). (*Id.* ¶22).

Further, 21 RS HB 1 had an emergency clause causing it take effect upon passage, which occurred on February 2, 2021. (*Id.* ¶23).

Next, 21 RS SB1,[3] among other things, removed the Governor's ability to suspend statutes, and limited all executive orders to 30 days unless extended by the Kentucky General Assembly, and permitted the Kentucky General Assembly to end emergency declarations and emergency orders. (*Id.* ¶24). 21 RS SB 1 also had an emergency clause causing it to take effect upon passage, which occurred on February 2, 2021. *Id.*

Similarly, 21 RS HJR 77[4] ended Governor Beshear's orders relating to business shutdowns, capacity restrictions, and the like. (*Id.* ¶25). 21 RS HJR 77 also had an emergency clause causing it to take effect upon passage, which occurred on March 30, 2021. *Id.*

To ensure that **all** enforcement of any executive orders stopped, regardless of when the violations occurred, the General Assembly defunded all such enforcement in 21 RS HB 192.[5] (*Id.* ¶26). In relevant part, that statute, which was the budget bill for 2020-2021 and 2021-2022 provided, at Section 37 (page 172-173 of the Act) as follows:

> Notwithstanding any statute or common law to the contrary, and except as provided in this Act, no state funds or state employee time shall be expended by any person or agency to implement or enforce any executive order issued **other than as authorized by KRS Chapter 39A through 39F, as amended by 2021 Regular Session SB1 and further amended by subsequent acts of the 2021 General Assembly**, **or other than as may**

---

[3] https://apps.legislature.ky.gov/record/21rs/sb1.html (last visited 7/11/2024).

[4] https://apps.legislature.ky.gov/record/21rs/hjr77.html (last visited 7/11/2024).

[5] https://apps.legislature.ky.gov/record/21rs/hb192.html (last visited 7/11/2024).

>**be implemented or enforced for a total sum not exceeding $10,000, inclusive of all state employee time and costs**, or other than as may relate to an emergency order issued relative to a natural disaster, or other than as may be approved by the General Assembly. Further, for the purpose of ensuring transparent government, **each and every executive order issued, whether or not subject to the aforesaid restrictions, shall provide simultaneously to the Legislative Research Commission the following items in a comprehensive report as a condition precedent for the expenditure of any state funds or use of any state employee time**:
>
>(1) A complete statement of each essential fact upon which the order is based;
>(2) A complete statement of each goal sought through issuance of the order;
>(3) A comprehensive analysis explaining how the executive order achieves each stated goal with the least burden placed upon the constitutional rights of the citizens of the Commonwealth of Kentucky and how each stated goal is accomplished with the most efficient use of tax payer money;
>(4) A detailed estimate of the anticipated expenditures of all state funds and all state employee time required for implementation or enforcement itemized in the smallest categories reasonably identifiable and stated in weekly increments; and
>(5) A detailed statement of all state funds and all state employee time actually expended for implementation or enforcement of each and every prior executive order upon the same issue or event, or substantially similar issue or event itemized in the smallest categories reasonably identifiable and stated in weekly increments.
>
>(6) Each comprehensive report shall be updated every 30 days subsequent to issuance of an executive order and provided to the Legislative Research Commission."

(emphasis added).

However, 21 RS HB 192 did not have an emergency clause and so, under the Kentucky Constitution, it became effective 90 days after the adjournment of the 2021 General Assembly, giving that statute an effective date of June 28, 2021.[6] (*Id.* ¶27).

As a consequence of the foregoing legislation and in reliance upon it, Brewed, on or about February 2, 2021, and at all times thereafter, prepared and complied with a plan that complied

---

[6] Ky. Const. § 55.

with the provisions of 21 RS HB 1. (*Id.* ¶28). Although Governor Beshear challenged the constitutionality of 21 RS HB1 and 21 RS HJR 77, by August 21, 2021, it was clear that the legislation was the law of the land as the Kentucky Supreme Court found the statutes constitutional. *Cameron v. Beshear*, 628 S.W.3d 61 (Ky. 2021). (*Id.* ¶29).

From June 28, 2021 to the present, Governor Beshear spent and directed the spending of significant amounts of state resources and time prosecuting the enforcement matter against the Plaintiffs, without making the required reports and statements as required by law under Section 37 of 21 RS HB192, which were required prerequisites prior to expending any funds or state employee time, and well in excess of the $10,000 limitation. (*Id.* ¶30). On or about May 21, 2021, the license revocation matter came on for hearing. (*Id.* ¶31). Among other things, it was apparent on that date that Brewed had a fully compliant HB1 plan, and had complied with it. *Id.* Governor Beshear nevertheless persisted with his illegal enforcement efforts. *Id.*

Into the summer of 2021 and thereafter, Governor Beshear expended and directed the expenditure of additional significant amounts of state employee funds and time pursuing Brewed in contravention of 21 RS HB 1, and in contravention of 21 RS HB 192. (*Id.* ¶32).

Internal emails, communications, and witnesses have confirmed that Governor Beshear: (i) had knowledge, on or after August 21, 2021, of the existence of Brewed's HB 1 plan and deliberately chose to continue their illegal enforcement against Brewed; and (ii) were aware of the budgetary restrictions in 21 RS HB 192 relating to their illegal actions and, on and after June 28, 2021, repeatedly and flagrantly chose to disregard those restrictions. (*Id.* ¶33).

While other enforcement measures related to no longer valid COVID-19 restrictions were resolved via settlement with the Department of Alcoholic Beverage Control, Governor Beshear

directed that no such settlement be offered to Brewed, because Governor Beshear desired to punish Brewed and Mr. Cooperrider for their First Amendment protected speech. (*Id.* ¶34).

On or about March 4, 2022, Defendants Taylor and Woods took final action to revoke Brewed's alcohol license, in violation of 21 RS HB1 and 21 RS HB 192. (*Id.* ¶35). This was done contrary to the recommendation of the hearing officer that heard the matter, and was done in a vindictive and retaliatory manner by their voluntary actions, and in accord with directives they received from Governor Beshear. *Id.* These actions were taken primarily to punish Brewed and Mr. Cooperrider for their First Amendment protected speech. *Id.*

The continuation of the enforcement against Brewed, up to and including the revocation of its alcohol license, was an adverse action that was designed to, and would, deter a person of ordinary firmness from continuing to engage in such protected speech. (*Id.* ¶38). Governor Beshear took other actions designed to deter persons of ordinary firmness from engaging in protected speech, including the issuance of public and other statements excoriating the Plaintiffs. *Id.* By taking these actions against Brewed and Mr. Cooperrider, Governor Beshear sought to silence anyone else brave enough to be critical of Defendants' actions. *Id.*

## II.  LAW AND ARGUMENT

### A. Standard of review

A motion to dismiss under Rule 12(b)(6) is reviewed de novo. *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012). Courts must "construe the complaint in the light most favorable to the plaintiff[] [and] accept all well-pleaded factual allegations as true." *Hill v. Snyder*, 878 F.3d 193, 203 (6th Cir. 2017). Further, all reasonable inferences must be presumed in plaintiffs' favor. *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008). Similarly, "[w]e review de novo the district court's ruling on a Rule 12(b)(1) motion to dismiss." *Am. Reliable Ins. Co. v. United*

7

*States*, 106 F.4th 498, 504 (6th Cir. 2024). In reviewing the district court's dismissal for lack of subject-matter jurisdiction, we "must construe the complaint in the light most favorable to the Plaintiffs; however, the Court need 'not presume the truth of factual allegations pertaining to our jurisdiction to hear the case.'" *Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 731-32 (6th Cir. 2022).

### B. Governor Beshear is not entitled to absolute immunity

Cases that discuss absolute immunity, including those cited by Governor Beshear, all demonstrate that absolute immunity is not applicable to the governor of a state who engages in First Amendment retaliation. Start with the U.S. Supreme Court cases. First, the standard: the Supreme Court has consistently "emphasized that the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns v. Reed*, 500 U.S. 478, 486-487 (1991). "The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Id.* "We have been quite sparing in our recognition of absolute immunity, and have refused to extend it any further than its justification would warrant." *Id.*

Second, *Butz v. Economou*, 438 U.S. 478 (1978). *Butz* involved a case where the Petitioner, as here, alleged federal agency officials retaliated against him for his speech in a license revocation action. *Id.* at 480. However, the U.S. Supreme Court in *Butz* was emphatic:

> The single submission by the United States on behalf of petitioners is that all of the federal officials sued in this case are absolutely immune from any liability for damages even if in the course of enforcing the relevant statutes they infringed respondent's constitutional rights and even if the violation was knowing and deliberate. Although the position is earnestly and ably presented by the United States, **we are quite sure that it is unsound and consequently reject it**.

*Id.* at 485 (emphasis added).

*Butz* then stated the default rule: "[w]e therefore hold that, in a suit for damages arising from unconstitutional action, … executive officials exercising discretion are entitled only to the

qualified immunity specified in *Scheuer*, subject to those exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of the public business." *Id.* at 507. The Court then explained that absolute immunity was provided to judges and prosecutors. *Id.* at 508-510. And the Supreme Court explained why absolute immunity was necessary and to whom it was extended: "Absolute immunity is thus necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation." *Id.* at 512. Yet there is no allegation here that Governor Beshear is a judge, advocate, or witness.

Next, *Cleavinger v. Saxner*, 474 U.S. 193, 206 (1985), where the Supreme Court declined to extend absolute immunity to a prison disciplinary board, on the basis that the "members had no identification with the judicial process of the kind and depth that has occasioned absolute immunity." That is the case with Governor Beshear here.

Governor Beshear also cites to *Van de Kamp v. Goldstein*, 555 U.S. 335, 338 (2009), yet that case was limited to the question of whether absolute immunity "extends to claims that the prosecution failed to disclose impeachment material, … due to: (1) a failure properly to train prosecutors, (2) a failure properly to supervise prosecutors, or (3) a failure to establish an information system containing potential impeachment material about informants." And in resolving that question, the Court observed that only administrative-related claims "directly connected with the conduct of a trial" by direct supervisors are protected by absolute immunity. *Id.* at 344. Moreover, other essential requirements for absolute immunity included that "an individual prosecutor's error in the plaintiff's specific criminal trial constitutes an essential element of the plaintiff's claim" and that the administrative requirement "necessarily require[s] legal knowledge and the exercise of related discretion." *Id.* And, critical to the extension of supervisory immunity was that the activities that were attacked were "directly connected with the

9

prosecutor's basic trial advocacy duties." *Id.* at 346.  Here, none of that is alleged with respect to Governor Beshear's role as someone who engaged in First Amendment retaliation.

Next, look to *Cooperrider*, 127 F.4th 1019, 1028 and the discussion of Newton's absolute immunity.  Newton was immune because of it was "within the scope of their duties 'in initiating a prosecution and in presenting the State's case.'"  Governor Beshear was not charged with presenting the ABC's case to the hearing officer, nor in appealing it to the ABC Board, nor preparing findings of the ABC board.  And while *Cooperrider* cited to *Butz* for the prospect that "absolute immunity extend[s] to administrative agency officials 'who are responsible for the decision to initiate or continue a proceeding subject to agency adjudication,'" the Governor of Kentucky is not charged with, and is not responsible by statute for, making *that* decision.  To the contrary, the head of the ABC department, the Commissioner, appoints staff.  KRS 241.015.  And it is the ABC department, and not the Governor, who administers the statutes at issue.  KRS 241.020.  And it is the ABC Board, and not the Governor, who holds hearings and deals with licenses.  KRS 241.060; KRS 13B.030; KRS 13B.120.  And it is the ABC Board, and not the Governor, who is responsible for the decision to initiate an enforcement proceeding.  KRS 243.520.

In fact, the Sixth Circuit found that only Newton, and not anyone else, was "**the person** responsible for initiating and continuing the enforcement action against Brewed." *Cooperrider*, 127 F.4th 1019, 1029.  The use of the term "the person" as opposed to "a person" makes clear that the Sixth Circuit only found that Newton met the traditional role of prosecutor: the person who signed the charges and presented the case.

In fact, the Sixth Circuit in *Cooperrider* observed that "to determine whether an individual public official is entitled to absolute immunity, 'we examine the nature of the

10

functions with which a particular official or class of officials has been <u>*lawfully entrusted*</u>' and 'evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions.'" *Id.*, citing *Forrester v. White*, 484 U.S. 219, 224 (1988).

True, Governor Beshear, with a prohibited First Amendment retaliatory animus, interjected himself in that process. Pl.'s Ver. Compl., DE#1, ¶¶ 33-38, PageID#1-14. And not only in that process, he interfered with the adjudication process by the ABC Board as well to carry out his retaliatory scheme. *Id.* But no statute placed him in the role of prosecuting the claims against Brewed nor in adjudicating such claims, and nowhere is such a role alleged in Plaintiffs' Complaint. Nor does Governor Beshear, the head of the executive branch of government in the Commonwealth, have an "identification with the judicial process of the kind and depth that has occasioned absolute immunity." *Cleavinger*, 474 U.S. 193, 206. And it cannot be said that Governor Beshear or his directives were "directly connected with the prosecutor's basic trial advocacy duties." *Goldstein*, 555 U.S. 335, 346. Certainly, there was no statutory basis that placed Governor Beshear in that role, nor is there any allegation of such. And that is dispositive based on the discussion in *Cooperrider*, because the Court must look to "the functions with which a particular official or class of officials has been lawfully entrusted." *Cooperrider*, 127 F.4th 1019, 1029.

In fact, the Sixth Circuit summed up the absolute prosecutorial immunity determination thusly: "The critical question is whether Newton was 'functioning in an enforcement role and acting as [an] advocate[] for the state in initiating and prosecuting judicial proceedings,' in which case he is 'entitled to an absolute immunity defense.'" *Cooperrider*, 127 F.4th 1019, 1029. Here, in contrast, there is no allegation Governor Beshear signed the charges, or actually

11

prosecuted the claims against Brewed, or that he acted as an advocate for the state in initiating and prosecuting the proceedings. And thus the "critical question" that afforded Newton absolute immunity by the Sixth Circuit is critically missing for Governor Beshear. *Id*.

Next, Governor Beshear argues that he is entitled to absolute immunity because his role also was akin to the role carried out by the ABC Board Defendants Woods and Taylor. (Motion at 2). But Woods and Taylor were not given absolute immunity by the Sixth Circuit because of a *prosecutorial function* or the supervision of a prosecutorial function. Instead, they were given absolute immunity because their functions were akin to the role of judges, and thus the Sixth Circuit analyzed their conduct under the doctrine of **quasi-judicial immunity**. *Cooperrider*, 127 F.4th 1019, 1030. That was because Woods and Taylor "are authorized by statute to oversee the conduct of administrative hearings and to delegate the power to issue recommended orders to subordinate hearing officers." *Id.* at 1032. There is no allegation that Governor Beshear is authorized by statute to oversee administrative hearings, to take evidence, or to review a record and issue a decision. Once again, that role is confined to Taylor and Woods. As a matter of law, it is the ABC department, and not the Governor, who administers the statutes at issue. KRS 241.020. And it is the ABC Board, and not the Governor, who holds hearings and deals with licenses. KRS 241.060; KRS 13B.030; KRS 13B.120. And it is the ABC Board, and not the Governor, who is responsible for the decision to initiate an enforcement proceeding. KRS 243.520.

Turning to the three factors analyzed by the Sixth Circuit in *Cooperrider* that gave rise to the finding of quasi-judicial immunity, none of those factors support the Governor here. *Cooperrider*, 127 F.4th 1019, 1031. First, and unlike Woods and Taylor,, Governor Beshear was not operating in a "position[] … akin to that of judges." *Id*. The Sixth Circuit looked to state

12

statute to determine that Woods and Taylor were operating in a position akin to a judge because they were statutorily charged with reviewing a record and issuing a decision. *Id.* Again, there is no similar statutory charge directed at Governor Beshear, nor is such alleged.

Nor does the second factor, handling controversial cases, support immunity for the Governor here. Governor Beshear is not given a statutory role in the adjudication process – and thus, in the ordinary course, he is simply not involved in any ABC license revocation process. His decision to interject himself, for purposes of unlawful political retaliation here, does not support the public policy concerns that drove the finding for Woods and Taylor on the second factor in *Cooperrider*. Governor Beshear is not charged with "issue[ing] orders suspending and revoking licenses to sell alcoholic beverages." *Cooperrider,* 127 F.4th 1019, 1033. And because he is not so charged, his role and ability to function as Governor is not "hindered if [he] were routinely sued for damages" for suspending and revoking alcohol licenses. *Id.* Thus, the second factor that favored Woods and Taylor does not favor the Governor.

And, while the Sixth Circuit found that there were regulatory safeguards, *id.*, those safeguards are directed at proceedings in the ordinary course for participants in the proceedings – or those statutorily charged with carrying out such proceedings. In contrast, and other than this lawsuit, there are no safeguards that protect someone like Plaintiffs from a Governor who is bent on carrying out a political vendetta because he is angry about protected speech critical of him. In fact, that is precisely why First Amendment retaliation claims are clearly established in the law.

Finally, Governor Beshear argues that law of the case applies. Finally, he is right, but for the wrong reason. Governor Beshear had the opportunity to argue for absolute immunity in the Sixth Circuit, and in fact argued that he was entitled to immunity; and he also could have taken a cross-appeal from this Court's decision not to grant him absolute immunity, yet he did not do so.

13

In *United States v. Adesida*, 129 F.3d 846, 850 (6th Cir. 1997), the Sixth Circuit explained the law-of-the-case appellate-forfeiture rule as: "The law-of-the-case doctrine bars challenges to a decision made at a previous stage of the litigation which could have been challenged in a prior appeal, but were not." *See, also, United States v. McKinley*, 227 F.3d 716, 718-719 (6th Cir. 2000) ("when a party fails to seek review of a district court's final order, it is barred from reasserting that issue in any subsequent appeals occurring in that case," the parties do not have "license to re-assert issues that they should have raised during an earlier appeal," and "waiver doctrine exists to forestall this kind of perpetual litigation by notifying parties that they will forfeit their claims if they fail to seek review in the first appeal"). Law of the case bars his present assertion of absolute immunity.

### III. CONCLUSION

The Governor's renewed motion to dismiss should be denied.

Respectfully submitted,

/s/ Christopher Wiest  
Christopher Wiest (KY 90725)  
Chris Wiest, Atty at Law, PLLC  
50 E. Rivercenter Blvd., Ste. 1280  
Covington, KY 41011  
Tel:   513/257-1895  
chris@cwiestlaw.com  
*Attorneys for Plaintiffs*

/s/ Thomas B Bruns  
Thomas B. Bruns (KY 84985)  
Bruns Connell Vollmar & Armstrong  
4555 Lake Forrest Drive, Suite 330  
Cincinnati, Ohio 45241  
Tel.:   513/312-9890  
tbruns@bcvalaw.com

### CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing upon Counsel for the Appellees this 4 day of April, 2025 via the Court's CM/ECF system, which will provide notice to all Counsel of Record.

/s/ Christopher Wiest  
Christopher Wiest (KBA 90725)